# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF OKLAHOMA

REUBIN E. LACAZE, JR., )
  )
   Plaintiff, )
  ) Case No. CIV- CIV-20-1281-G
v. )
  ) **ATTORNEY'S LIEN CLAIMED**
THE CITY OF OKLAHOMA CITY, a; ) **JURY TRIAL DEMANDED**
municipal corporation; WADE GOURLEY, )
individually; BILL WEAVER, individually; )
VANCE ALLEN, individually; )
and DOUG KIMBERLIN, individually, )
  )
   Defendants. )

## COMPLAINT

**COMES NOW** Plaintiff Reubin E. Lacaze, Jr. ("Lacaze") and, for his causes of action against Defendants The City of Oklahoma City, a municipal corporation ("City"); Wade Gourley, individually ("Gourley"); Bill Weaver, individually ("Weaver"); Vance Allen, individually ("Allen"); and Doug Kimberlin, individually ("Kimberlin"), alleges and states as follows:

### The Parties

1. Lacaze is and at all relevant times has been a citizen of the State of Oklahoma and a resident of the Western District of Oklahoma.

2. Defendant City is and at all relevant times has been a municipal corporation organized under the laws of the State of Oklahoma with its principal place of business and operations in the Western District of Oklahoma.

3. Defendant Gourley is and at all relevant times has been a citizen of the State of Oklahoma and a resident of the Western District of Oklahoma.

4. Defendant Bill Weaver is and at all relevant times has been a citizen of the State of Oklahoma and a resident of the Western District of Oklahoma.

5. Defendant Allen is and at all relevant times has been a citizen of the State of Oklahoma and a resident of the Western District of Oklahoma.

6. Defendant Kimberlin is and at all relevant times has been a citizen of the State of Oklahoma and a resident of the Western District of Oklahoma.

## Jurisdiction and Venue

7. The Court has subject matter jurisdiction over this cause pursuant to 28 U.S.C. § 1331 because all of Lacaze's claims arise under federal law, *i.e.* 42 U.S.C. § 1981 and 42 U.S.C. § 2000e *et seq.*

8. The Court has personal jurisdiction over all of the defendants in this cause because they are all citizens of the State of Oklahoma.

9. Venue is proper in this Court because the claim arose entirely within this judicial district.

## Factual Allegations

10. Lacaze is an African American male.

11. Lacaze applied for and was accepted into the Oklahoma City Police Department ("OCPD") Police Academy in or around 1992. Lacaze successfully completed the Academy and began his duties as a police officer in early 1993.

12.     In 2001, the OCPD temporarily assigned Lacaze to the Oklahoma City Vice Unit. He was permanently assigned to the Vice Unit in or around April of 2002. Lacaze was assigned to the Vice Unit until he was placed on administrative leave and later terminated from OCPD.

13.     During the course of his employment with OCPD, including during his employment at the Vice Unit, Lacaze received written performance evaluations. His performance evaluations have historically ranged from satisfactory to superior.

14.     In addition to positive written performance evaluations, Lacaze has also received a variety of commendations during his time as an officer.

15.     In or around 2013, Lacaze was promoted to the rank of Inspector, and he continued his duties at that rank in the Vice Unit until he was placed on administrative leave and later terminated.

16.     In late 2017 or early 2018, Defendant Doug Kimberlin expressed an interest in having the Vice Unit conduct demand suppression operations. Kimberlin was employed at the rank of Lieutenant; he supervised Lacaze.

17.     In that time frame, Kimberlin was supervised by Defendant Vance Allen, who was employed at the rank of Captain.

18.     In that time frame, Defendant Allen was supervised by Defendant Bill Weaver, who was employed at the rank of Major.

19.     Lacaze and the other officers employed in the Vice Unit had conducted demand suppression operations in the past. Lacaze and the others were familiar with the policies, procedures, and practices for these types of operations.

20. Defendant Kimberlin expressed that the operations he envisioned would be smaller in scale and scope than in the past because of manpower and overtime concerns. Accordingly, Defendant Kimberlin arranged to have two undercover female patrol officers temporarily assigned to the Vice Unit. The female patrol officers were assigned to solicit prostitution customers.

21. As a result of Defendant Kimberlin's plans, a demand suppression operation was scheduled for March 28, 2018. The operation was conducted at a hotel. The Vice Unit occupied three rooms of the hotel. There were two operational rooms where the female officers were stationed and one processing room where the Vice Unit officers were stationed. In the processing room, the officers completed paperwork and collected and processed evidence and the personal belongings of the arrestees.

22. Lacaze was present at the hotel, as was Defendant Kimberlin. Defendants Allen, Weaver, and Gourley were not present.

23. Defendant Kimberlin ordered the officers to follow a different procedure than they had used in the past because he did not want the officers to work overtime hours. Defendant Kimberlin's directions eliminated a number of safeguards relating to the proper booking of drug evidence.

24. Ordinarily, the officers collect all of the evidence from the operation and take all of it back to the office. If suspected narcotic evidence is collected, the officer that finds the evidence weighs it, tests it at the Special Projects Office, puts it in a drug envelope, seals the envelope, and then provides a seal number to the officer booking the evidence in the property room.

25. At the March 28, 2018 operation, Defendant Kimberlin dispensed with this procedure. Defendant Kimberlin told the officers under his supervision to take all of the evidence, including suspected narcotic evidence, straight to the property room and book it there.

26. During the March 28 operation, one of the prostitution customers who was arrested was Brandon Brawley. Brawley was ultimately charged with two crimes on May 15, 2018 in Oklahoma County Case No. CM-18-2962. Brawley is now deceased.

27. Brawley had two glass pipes and a suspected narcotic substance on his person when he was arrested.

28. At the end of the operation, Kimberlin assigned Lacaze and Detective Rivera to book all of the property seized from all of the arrestees. There were over 10 individuals arrested during that operation.

29. After Lacaze and Rivera were assigned to book the property, Detective Coffey approached Lacaze and handed him a brown paper sack. Coffey said, "There is supposed to be a small amount of meth and some glass pipes in this bag." Coffey continued, "We didn't charge the guy with paraphernalia, so you can just throw the pipes away or dispose of them or whatever, but I need you to book the meth for me."

30. There were significant chain of custody errors related to the alleged methamphetamine in the brown paper sack. These chain of custody errors occurred before Coffey gave the brown paper sack to Lacaze.

31. None of the officers who handled the suspected narcotic evidence at the scene could confirm that it was actually in the brown paper sack given to Lacaze.

32. None of the officers who handled the suspected narcotic evidence at the scene weighed the suspected narcotic evidence.

33. None of the officers who handled the suspected narcotic evidence at the scene tested the suspected narcotic evidence to confirm that it was, in fact, methamphetamine.

34. The officers who handled the suspected narcotic evidence at the scene variously described the substance as a "white powdery substance" or a "crystal substance."

35. Lacaze and Rivera ultimately returned to the OCPD Property Management Unit ("PMU") with all of the evidence that they had been provided. Lacaze, while in the PMU, was in possession of the brown paper sack that Detective Coffey gave to him. Lacaze looked in the sack, but he did not see any alleged narcotic substance. Lacaze only saw two glass pipes.

36. Lacaze disposed of the glass pipes as instructed by Det. Coffey.

37. One officer who handled the suspected narcotic evidence on the scene wrote a police report affirmatively stating that the substance was in fact methamphetamine, even though the officer knew that the substance had not been tested.

38. Another officer who handled the suspected narcotic evidence on the scene wrote a probable cause affidavit affirmatively stating that the substance had been weighed (0.03 grams) and tested positive as methamphetamine, even though the officer knew that the substance had not been weighed or tested.

39. Officers also prepared jail disposition sheets reporting that charges had been filed, when charges had not been filed.

40. Defendant Kimberlin signed the probable cause affidavit containing the false statement that the substance had been confirmed as methamphetamine.

41. The next day, Det. Coffey asked Lacaze for a drug seal number. At that point, Lacaze remembered there was supposed to have been methamphetamine in the brown paper sack with the glass pipes. Lacaze told Coffey, "I didn't see any meth in there, but if meth was in the bag you gave me, it got thrown away."

42. Based on Lacaze's training, education, and experience, he did not believe that the misplaced substance warranted significant attention, due to the fact it was alleged to have been a very small amount.

43. Consistent with his training, education, and experience, Lacaze prepared a supplemental police report wherein he stated that the substance had been misplaced. Lacaze forwarded the supplemental report to Det. Coffey.

44. Coffey did not make any changes to the report.

45. On March 31, 2018, Lacaze completed the supplemental report and submitted it to Defendant Kimberlin for review.

46. Defendant Kimberlin neglected to review the report until April 5, 2018.

47. When Defendant Kimberlin reviewed the report, he knew that he had signed a probable cause affidavit with a false statement. Defendant Kimberlin also realized that other officers under his supervision had made false statements in a police report and on jail disposition sheets as described above.

48. Defendant Kimberlin reported the misplaced evidence to his supervisor, Defendant Allen. Kimberlin and Allen were ultimately directed to conduct an internal investigation into allegations of misconduct against Lacaze and only Lacaze.

49. The OCPD employs a number of trained internal investigators in its Internal Affairs Unit. These officers conduct internal administrative investigations against officers, but in this case, Defendant City authorized Kimberlin and Allen to conduct the investigation, even though Kimberlin had a direct conflict of interest and even though Kimberlin had no experience conducting this type of investigation. Furthermore, Kimberlin was allowed to conduct the investigation even though he was a witness at the scene and even though he was a witness to conversations with Lacaze before the investigation began.

50. Defendant City allowed a similar unfair procedure in the past against another African American officer, Shannon McCarty. Defendant City has demonstrated a pattern of allowing white supervisors to investigate African American subordinates, even though the white supervisor was involved in the alleged misconduct.

51. Kimberlin and Allen conducted an eight-month investigation into this missing evidence. After their collection of evidence ended, the City waited an additional 9 months before imposing any discipline on Lacaze.

52. This lengthy process violated the Collective Bargaining Agreement's Officer's Bill of Rights, which requires timely, prompt investigations. Generally, this Bill of Rights anticipates that investigations will be completed within 90 days.

53. As a part of this investigation, Kimberlin and Allen both learned about the significant chain of custody errors with the alleged methamphetamine by other officers

who were not African American. Kimberlin and Allen both learned that none of the officers who handled the substance at the scene could confirm it was actually placed in the brown paper sack.

54. As a part of this investigation, Allen learned that Kimberlin had deviated from ordinary procedures and eliminated important safeguards for the collection of evidence. For example, one of the officers interviewed during the investigation stated that "I don't think any of this would have happened if we would have been allowed to do our job the way we normally do it."

55. In preparing summaries of interviews and his final investigative report, Kimberlin made false statements. For example, Kimberlin stated in his final investigate report that a certain detective "was able to confirm" information about the missing narcotic evidence. However, that was not a true statement.

56. Defendants Allen, Weaver, and Gourley knew that Kimberlin's statements were false.

57. As a part of the investigation, Defendant City administered a polygraph examination for several officers, including Lacaze. The polygraph examiner found no evidence that Lacaze was untruthful in writing his report, in his conversations with Kimberlin, or in any interview during the lengthy investigation.

58. Defendant Gourley terminated Lacaze's employment based on an allegation that Lacaze was untruthful.

59. Defendants Gourley, Weaver, Allen, and Kimberlin knew that Lacaze was not untruthful during the investigation.

60.     Defendants Gourley, Weaver, Allen, and Kimberlin knew that (1) other officers were untruthful in signed documents, including a probable cause affidavit; and (2) Kimberlin was untruthful in statements he made in his investigative report. However, those individuals were not terminated. None of those individuals were African American.

61.     Defendants Gourley, Weaver, Allen, and Kimberlin knew that other officers who were not African American had been subject to lesser discipline than termination for untruthful statements, both on duty and off duty.

62.     On November 9, 2020, Arbitrator Tommy C. Kessinger entered an Arbitration Award finding that all of the City's allegations of misconduct against Lacaze were unfounded. The arbitrator reinstated Lacaze and awarded him full back pay and benefits.

### FIRST CAUSE OF ACTION –VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, AS AMENDED

63.     Lacaze incorporates the above and foregoing allegations as though set forth in full herein.

64.     This First Cause of Action is asserted against Defendant City only.

65.     Lacaze is in a protected class under Title VII as an African American.

66.     Lacaze performed his job duties and responsibilities in a satisfactory manner at all times during his employment with Defendant City.

67.     Lacaze suffered adverse employment actions when he was placed under a lengthy internal investigation and when he was terminated from his employment.

68. Defendant City took these adverse actions against Lacaze because of or in significant part because of his race, African American.

69. Any reason that Defendant City asserts justifying these adverse actions is merely a pretext for unlawful race discrimination.

70. As a direct and proximate result of Defendant City's actions, Lacaze has suffered economic and non-economic damages, including lost wages and benefits, mental anguish and emotional distress, sleeplessness, anxiety, humiliation, embarrassment, damage to his professional reputation, inconvenience, loss of enjoyment of life, and other non-pecuniary losses, all to his detriment and damage in a sum in excess of Seventy-Five Thousand Dollars and No/100 ($75,000.00).

**WHEREFORE** Plaintiff Reubin E. Lacaze, Jr. prays for judgment against Defendant City of Oklahoma City as follows:

(1) For his actual damages in a sum in excess of Seventy-Five Thousand Dollars and No/100 ($75,000.00);

(2) For his court costs and attorney's fees;

(3) For pre-judgment and post-judgment interest as allowed by law;

(4) For equitable relief prohibiting Defendant City from discriminating against Lacaze on the basis of his race in the future; and

(5) For any other such and further relief as the Court or jury deems just and equitable that is allowed by law.

## SECOND CAUSE OF ACTION – VIOLATION OF
## THE CIVIL RIGHTS ACT OF 1866, 42 U.S.C. § 1981

71. Lacaze incorporates the above and foregoing allegations as though set forth in full herein.

72. This Second Cause of Action is asserted against all defendants.

73. Lacaze is in a protected class under § 1981 as an African American.

74. Lacaze performed his job duties and responsibilities in a satisfactory manner at all times during his employment with Defendant City.

75. Lacaze suffered adverse employment actions when he was placed under a lengthy internal investigation and when he was terminated from his employment.

76. Defendant City and the Individual Defendants took these adverse actions against Lacaze because of his race, African American.

77. Defendant Gourley made the final decision, however, the Individual Defendants were instrumental in causing Lacaze's discharge because they prepared or reviewed the final report accusing Lacaze of untruthfulness, adopted the report as full, accurate, and complete, and advocated for Lacaze's termination with Gourley.

78. As a direct and proximate result of the Defendants' actions, Lacaze has suffered economic and non-economic damages, including lost wages and benefits, mental anguish and emotional distress, sleeplessness, anxiety, humiliation, embarrassment, damage to his professional reputation, inconvenience, loss of enjoyment of life, and other non-pecuniary losses, all to his detriment and damage in a sum in excess of Seventy-Five Thousand Dollars and No/100 ($75,000.00).

**WHEREFORE** Plaintiff Reubin E. Lacaze, Jr. prays for judgment against the Defendants as follows:

(1) For his actual damages in a sum in excess of Seventy-Five Thousand Dollars and No/100 ($75,000.00);

(2) For punitive and exemplary damages against the individual defendants;

(3) For his court costs and attorney's fees;

(4) For pre-judgment and post-judgment interest as allowed by law;

(5) For equitable relief prohibiting Defendant City from discriminating against Lacaze on the basis of his race in the future; and

(6) For any other such and further relief as the Court or jury deems just and equitable that is allowed by law.

## THIRD CAUSE OF ACTION – CONSPIRACY TO VIOLATE CIVIL RIGHTS

79. Lacaze incorporates the above and foregoing allegations as though set forth in full herein.

80. The Defendants, either implicitly or explicitly, entered into an unlawful agreement to deprive Lacaze of his federal rights by agreeing to cause Lacaze's termination because of his race, African American.

81. The Defendants each took an overt act in furtherance of the conspiracy.

82. The Defendants are jointly and severally liable for the entire scope of the conspiracy, no matter how small a role each of them played in the overall conspiracy.

83. As a direct and proximate result of the Defendants' actions, Lacaze has suffered economic and non-economic damages, including lost wages and benefits, mental

anguish and emotional distress, sleeplessness, anxiety, humiliation, embarrassment, damage to his professional reputation, inconvenience, loss of enjoyment of life, and other non-pecuniary losses, all to his detriment and damage in a sum in excess of Seventy-Five Thousand Dollars and No/100 ($75,000.00).

**WHEREFORE** Plaintiff Reubin E. Lacaze, Jr. prays for judgment against the Defendants as follows:

(1)   For his actual damages in a sum in excess of Seventy-Five Thousand Dollars and No/100 ($75,000.00);

(2)   For punitive and exemplary damages against the individual defendants;

(3)   For his court costs and attorney's fees;

(4)   For pre-judgment and post-judgment interest as allowed by law;

(5)   For equitable relief prohibiting Defendant City from discriminating against Lacaze on the basis of his race in the future; and

(6)   For any other such and further relief as the Court or jury deems just and equitable that is allowed by law.

Dated this 22nd day of December, 2020.

/s/ Barrett T. Bowers
Barrett T. Bowers, OBA#30493
THE BOWERS LAW FIRM
P.O. Box 891628
Oklahoma City, Oklahoma 73189
(405) 727-7188 – T
barrett@bowerslawok.com