## UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| REUBIN E. LACAZE, JR., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Case No. CIV-20-1281-G |
| | ) |
| THE CITY OF OKLAHOMA | ) |
| CITY et al., | ) |
| | ) |
| Defendants. | ) |

## OPINION AND ORDER

Now before the Court is a Motion for Summary Judgment filed by Defendant City of Oklahoma City ("City") (Doc. No. 66). Plaintiff Reubin E. Lacaze, Jr. has submitted a Response (Doc. No. 112), and Defendant City has submitted a Reply (Doc. No. 118). Having reviewed the parties' submissions, the Court makes its determination.

In March 2018, following a "demand suppression operation" by the Oklahoma City Police Department's ("OCPD") Vice Unit, a brown paper sack thought to contain methamphetamine and drug paraphernalia was not booked into evidence. Plaintiff, who was an OCPD sergeant and the officer responsible for booking the narcotics, became the subject of an investigation into the whereabouts of the missing evidence. At the end of the investigation, Plaintiff elected to participate in a disciplinary proceeding called a "predetermination hearing" presided over by then-Deputy Chief Wade Gourley.

Following the predetermination hearing, Gourley sustained all allegations of misconduct against Plaintiff, which included allegations that Plaintiff had lost or thrown away "narcotic evidence," that Plaintiff had failed to notify his supervisor of the missing

evidence, and that Plaintiff was untruthful about what had happened to the evidence in an official police report and during the subsequent investigation.  Plaintiff was terminated for untruthfulness in September 2019 by Gourley, who was by then the OCPD Chief of Police. Plaintiff was later reinstated to his position following an arbitration.

On December 22, 2020, Plaintiff initiated this federal lawsuit against Defendants City of Oklahoma City ("City"), OCPD Chief of Police Wade Gourley, OCPD Major Bill Weaver, OCPD Captain Vance Allen, and OCPD Lieutenant Doug Kimberlin.  *See* Compl. (Doc. No. 1).  In his Complaint, Plaintiff alleges claims of racial discrimination in violation of Title VII of the Civil Rights Act of 1964 against Defendant City, racial discrimination in violation of 42 U.S.C. § 1981 against all Defendants, and conspiracy to violate civil rights against all Defendants.  *See id.* ¶¶ 63-83.  Defendant City seeks summary judgment on all of Plaintiff's claims.  *See* Def.'s Mot. at 18-29.

## I.       *Standard of Review*

Summary judgment is a means of testing in advance of trial whether the available evidence would permit a reasonable jury to find in favor of the party asserting a claim.  The Court must grant summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

A party that moves for summary judgment has the burden of showing that the undisputed material facts require judgment as a matter of law in its favor.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  To defeat summary judgment, the nonmovant need not convince the Court that it will prevail at trial, but it must cite sufficient evidence admissible at trial to allow a reasonable jury to find in the nonmovant's favor—i.e., to show

that there is a question of material fact that must be resolved by the jury.  *See Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005).  The Court must then determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

Parties may establish the existence or nonexistence of a material disputed fact by:

- citing to "depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" in the record; or

- demonstrating "that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."

Fed. R. Civ. P. 56(c)(1)(A), (B).  While the Court views the evidence and the inferences drawn from the record in the light most favorable to the nonmoving party, *see Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. PepsiCo, Inc.*, 431 F.3d 1241, 1255 (10th Cir. 2005), "[t]he mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the [nonmovant]."  *Liberty Lobby*, 477 U.S. at 252.

    II.    *Undisputed Material Facts*[1]

    A.    <u>The Demand Suppression Operation</u>

Plaintiff, who is African American, began working as a police officer for the OCPD in 1993 and was permanently assigned to the Vice Unit in 2001.  *See* Def.'s Mot. Ex. 1

---

[1] Facts relied upon are uncontroverted or, where genuinely disputed, identified as such and viewed in the light most favorable to Plaintiff as the nonmoving party.

3

(Doc. No. 67) at 12:20-13:6; Pl.'s Resp. (Doc. No. 112) at 31.  In March 2018, the Vice Unit conducted a week long demand suppression operation targeting prostitution customers at various hotels in Oklahoma City.  *See* Def.'s Mot. Ex. 1, at 23:10-24:8.  On the evening of March 28, 2018, as a result of the suppression operation, OCPD officers arrested Brandon Brawley for possession of methamphetamine and soliciting prostitution services at the Wyndham Hotel.  *See* Def.'s Mot. Ex. 2 (Doc. No. 66-2); Def.'s Mot. Ex. 30 (Doc. No. 80) at 34:1-37:15.  Det. Jeff Coffey prepared the probable cause affidavit for Brawley's arrest (the "Brawley P.C. Affidavit"), and Off. Kelsey Lawson[2] and Lt. Kimberlin signed the affidavit.  *See* Def.'s Mot. Ex. 30, at 34:1-13; Def.'s Mot. Ex. 31 (Doc. No. 66-31).

The probable cause affidavit states that upon Brawley's arrest, officers recovered a "small clear ziptop plastic baggie that contained a[n] off white crystal-like substance with a total package weight of 0.03 grams."  Def.'s Mot. Ex. 31.  The probable cause affidavit further represents that "[t]he substance later field tested positive for Methamphetamine." *Id.*  At the time Det. Coffey prepared the probable cause affidavit, however, the substance recovered had not been tested.  Def.'s Mot. Ex. 30, at 34:17-25.  Det. Coffey later testified in a deposition that he expected the substance would be tested prior to being booked into the property room.  *Id.* at 35:1-7.

At the conclusion of the March 28, 2018 operation, Lt. Kimberlin assigned Plaintiff and Det. Alonzo Rivera to book the evidence from the evening's operation.  Def.'s Mot. Ex. 1, at 47:17-21.  Before Plaintiff left the Wyndham, Det. Coffey handed him a brown

---

[2] Off. Lawson (now Brown) was the female officer posing as a prostitute who was propositioned by Brawley.  Def.'s Mot. at 22.

paper sack, informing Plaintiff that the sack contained methamphetamine, which had not yet been tested,[3] and two glass pipes. *Id.* at 47:22-48:7. According to Plaintiff, Det. Coffey asked Plaintiff to book the narcotic evidence into OCPD's property room but indicated that the two glass pipes could be disposed of. *See id.* at 48:1-7. Plaintiff represents that he took the sack from Det. Coffey without looking inside and left the Wyndham. *See id.* at 61:17-25, 67:6-14. Plaintiff and Det. Rivera arrived at the Property Management Unit ("PMU") at 1:09 a.m. on Thursday March 29, 2018, to book the evidence, and after booking the evidence, Plaintiff and Det. Rivera went to their homes. *See id.* at 80:9-12, 97:15-21, 103:14-18.

On the morning of March 30, 2018, Det. Coffey asked Plaintiff for the "drug seal number" of the narcotic evidence that was supposed to have been booked into the property room. *See id.* at 102:5-103:8, 114:2-6. Plaintiff was not able to provide the drug seal number and told Det. Coffey, "If the meth was in the bag with those pipes, then it got thrown away, but I didn't see it." *Id.* at 102:22-103:5. Plaintiff then told Det. Coffey that he would prepare a report on the missing evidence. *See id.* at 103:12-13.

The next day Plaintiff created a supplemental report within the OCPD Vice Unit reporting system, with the description "Lost Evidence – Brawley" on the front cover and containing the narrative "[t]he baggie of meth and meth pipes were misplaced prior to the booking process and were unable to be located." Def.'s Mot. Ex. 5 (Doc. No. 66-5). The

---

[3] Members of the Vice Unit are required to adhere to the Standard Operating Procedures for the unit regarding the collection and preservation of evidence. Def.'s Mot. Ex. 3 (Doc. No. 66-3) § 1000.00; *see also* Def.'s Mot. Ex. 4 (Doc. No. 66-4) §§ 184.01, 184.10, 184.30.

OCPD Vice Unit activity reporting system reflects that Plaintiff and Det. Coffey updated and reviewed the report multiple times on March 31 and April 2, 2018. *See* Def.'s Mot. Ex. 6 (Doc. No. 66-6) at 1-2. The report was then updated and reviewed by Plaintiff on April 3, 2018, and submitted to Lt. Kimberlin for approval. *See* Def.'s Mot. Ex. 6, at 2; Def.'s Mot. Ex. 5, at 1.

<b>B.     The Administrative Investigation and Disciplinary Process</b>

Lt. Kimberlin reviewed the report on April 5, 2018, and then called Plaintiff and Det. Coffey to his office to discuss the misplaced evidence. *See* Def.'s Mot. Ex. 1, at 68:2-10; *see also* Def.'s Mot. Ex. 7 (Doc. No. 68) at 104:1-23. Lt. Kimberlin directed Plaintiff, Det. Coffey, and Det. Rivera to go to the PMU to search for the evidence, which they did to no success. Def.'s Mot. Ex. 7, at 104:19-105:7; Def.'s Mot. Ex. 1, at 131:3-6. After informing his supervisor, Capt. Allen, of the report of misplaced evidence, Lt. Kimberlin was instructed to conduct an administrative investigation into the matter on April 7, 2018. *See* Def.'s Mot. Ex. 8 (Doc. No. 84) at 4.

On June 27, 2018, Lt. Kimberlin conducted an interview of Plaintiff with a Fraternal Order of Police ("FOP") representative present. *See* Def.'s Mot. Ex. 12 (conventionally filed). During this interview, Plaintiff indicated that he did not conduct a search upon realizing that the narcotic evidence was missing because if he had left the bag containing the narcotic evidence on the PMU room countertop, where he last recalled seeing it, someone would have found the sack and called him. *See id.* at 21:03-22:08. Subsequently, on September 27, 2018, Lt. Kimberlin and Capt. Allen interviewed Plaintiff again. Def.'s Mot. Ex. 17 (Doc. No. 70). In this interview, Plaintiff stated he threw away the paper sack

6

in a dumpster located outside of the PMU, thinking the sack only contained glass pipes and no narcotic evidence. *See id.* at 6:251-266. Plaintiff stated that he realized that he threw the paper sack away when Det. Coffey asked for the drug seal number. *See id.* at 31:400-32:406. On November 28, 2018, Capt. Allen requested that a polygraph examiner administer a series of polygraph examinations on those involved in the missing narcotic evidence's chain of custody, including Plaintiff and Det. Coffey. *See* Def.'s Mot. Ex. 19 (Doc. No. 72) at 1. Those examinations reported inconclusive results for both Plaintiff and Det. Coffey. *Id.* at 1, 5.

On January 30, 2019, Plaintiff was placed on Administrative Leave with pay at the direction of then-OCPD Chief Bill Citty. *See* Def.'s Mot. Ex. 20 (Doc. No. 73). On April 9, 2019, Lt. Kimberlin and Capt. Allen conducted a third interview with Plaintiff, presenting Plaintiff with allegations of untruthfulness, which Plaintiff denied. *See* Def.'s Mot. Ex. 21 (Doc. No. 74). On May 3, 2019, Plaintiff received a Predetermination Hearing Notification from then-Deputy Chief Wade Gourley. *See* Def.'s Mot. Ex. 22 (Doc. No. 75) at 14-26. The May 3, 2019 Predetermination Hearing Notification contained six allegations of misconduct regarding the lost evidence and Plaintiff's untruthfulness during the subsequent investigation. *See id.* at 14-15.

The predetermination hearing was held on May 19, 2019. *See* Def.'s Mot. Ex. 23 (Doc. No. 76) at 1. Deputy Chief Gourley was the hearing examiner. *See id.* Capt. Allen was the presenter, reporting the facts gathered throughout the investigation, and Lt. Kimberlin was a witness. *See id.* at 1, 5-7. Plaintiff, who had a FOP representative present with him, was given the opportunity to present his own evidence and refute the allegations

7

against him.  *See id.* at 41-51.  Plaintiff admitted that he had thrown the sack away, that the wording of his report was inaccurate, and that his actions showed a lack of judgment, but Plaintiff insisted that he did not intend to mislead anyone.  *See id.* at 42-48.  Plaintiff explained that he was frustrated and embarrassed, which led to his lapse in judgment, admitting he knew he should have stated in his report that he threw the sack away.  *See id.* Deputy Chief Gourley presented his findings sustaining the allegations against Plaintiff to then-interim OCPD Chief Jeff Becker.  *See* Def.'s Mot. Ex. 24 (Doc. No. 77).

In July 2019, Deputy Chief Gourley was appointed as OCPD Chief of Police.  Def.'s Mot. Ex. 26 (Doc. No. 66-26) ¶ 1.  No decision on the findings of the predetermination hearing had been made in the interim.  On September 5, 2019, Chief Gourley terminated Plaintiff's employment with the OCPD, citing Plaintiff's "[u]ntruthfulness."  *See* Def.'s Mot. Ex. 27 (Doc. No. 79).

Subsequently, following an arbitration proceeding, Plaintiff was reinstated to his position as a sergeant/investigator with OCPD.  Compl. ¶ 62.

C.    <u>Alleged Comparators</u>

Plaintiff alleges four instances in which he believes that white officers were treated more leniently than Plaintiff for similar violations of the OCPD's rules regarding truthfulness.  The first instance in which non-minority comparators allegedly received more lenient treatment involves Det. Coffey, Off. Lawson, and Lt. Kimberlin, the three white officers who either prepared, signed, or approved the Brawley P.C. Affidavit.  Plaintiff argues that these three officers were never disciplined for including

8

unsubstantiated statements in the sworn affidavit and violating OCPD procedure with respect to truthfulness.  *See* Pl.'s Resp. at 40.

OCPD Rule 120.0 provides that "[t]estifying, making reports, or conducting business in a less than truthful and cooperative manner is prohibited."  Def.'s Mot. Ex. 22, at 10.  OCPD Procedure 361.05 prescribes:

> An officer, who arrests an individual for any drug violation, must perform a field test on the drug(s) and obtain a positive indication for the drug.  The officer is responsible for including this information in the probable cause affidavit.  The jail provides supplies used for field-testing cocaine, methamphetamine, amphetamines and heroin.

Pl.'s Resp. Ex. 12 (Doc. No. 114-12) at 2.  Additionally, OCPD Procedure 184.30 directs that "[f]ield-testing of narcotics will be utilized to identify possible evidence prior to booking of the suspect."  Def.'s Mot. Ex. 4 (Doc. No. 66-4).

In his deposition, Plaintiff acknowledged that it was the OCPD practice at the time of the suppression operation to not field test narcotic evidence because of concern that the substance may be fentanyl.  Def.'s Mot. Ex. 1, at 254:11-255:7.  Plaintiff represented that upon recovering narcotic evidence during an investigation, Vice officers would take the narcotics back to the Vice office to test, weigh, package, and assign a drug seal number prior to booking the evidence into the property room.  *See id.*  If the narcotic evidence tested differently than was initially stated in a probable cause affidavit, the officers who prepared the affidavit would be notified and they would correct the affidavit.  *See id.*

Plaintiff also identifies Off. D.G. Brewer and Maj. William Patten as comparators.  *See* Pl.'s Resp. at 41.  Off. Brewer is a white officer who was issued a Class III reprimand by Chief Gourley, but was not terminated, for making false statements to criminal

9

investigators relating to a 2017 domestic assault incident involving Off. Brewer and his then-wife, who was also a police officer.  *See* Pl.'s Resp. Ex. 21 (Doc. No. 115-21) (filed under seal).  Relatedly, Maj. William Patten, a white police officer, was not disciplined for his actions when he, in connection with a civil case arising out of the Brewer incident, deleted personal text messages relating to the incident.  *See* Pl.'s Resp. Ex. 24 (Doc. No. 114-24) at 32:1-33:6; Pl.'s Resp. Ex. 5 (Doc. No. 115-5) at 61:4-25.

Finally, Plaintiff offers Det. Bryn Carter as a comparator.  Det. Carter is a white officer who, during Gourley's tenure as Chief, was accused of perjury in a sworn probable cause affidavit by David Prater, the then-District Attorney of Oklahoma County ("D.A. Prater").  *See* Pl.'s Resp. Ex. 23 (Doc. No. 114-23).  Det. Carter was subsequently investigated by OCPD's Internal Affairs unit at Chief Gourley's direction.  *See* Pl.'s Resp. Ex. 5, at 56:1-57:20.  Chief Gourley represents that the investigation found D.A. Prater's allegations to not be substantiated, and so Det. Carter was not disciplined.  *See id.*  In response, D.A. Prater informed Chief Gourley that his office would no longer take charges where Det. Carter was an affiant on a probable cause affidavit and that his office had a duty to give *Brady*/*Giglio* disclosures in all cases where Det. Carter was a witness.  *See* Pl.'s Resp. Ex. 23, at 3.

### III.   Discussion

As noted, Defendant City seeks summary judgment on Plaintiff's claim that his termination constituted racial discrimination in violation of Title VII and 42 U.S.C. § 1981,

as well as Plaintiff's claim for conspiracy to violate Plaintiff's civil rights. The Court considers each claim in turn.

A.     Racial Discrimination in Violation of Title VII

Under Title VII, it is unlawful for an employer to discharge an individual or otherwise discriminate against that individual "because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). "A plaintiff alleging discrimination on the basis of race may prove intentional discrimination through either direct evidence of discrimination (e.g., oral or written statements on the part of a defendant showing a discriminatory motivation) or indirect (i.e., circumstantial) evidence of discrimination." *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1225 (10th Cir. 2000).[4] *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), provides the analytical framework for claims of disparate treatment involving circumstantial evidence of discrimination, as are at issue here. Under this framework, the plaintiff must first establish a prima facie case of discrimination. *See id.* at 802. If the plaintiff satisfies this initial burden, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason" for its decision. *Id.* Then, if the defendant meets this burden, "summary judgment is warranted unless [the plaintiff] can show there is a genuine issue of material fact as to whether [the defendant's] proffered reasons are pretextual." *Plotke v. White*, 405 F.3d

_____

[4] "In racial discrimination suits, the elements of a plaintiff's case are the same whether that case is brought under §§ 1981 or 1983 or Title VII." *Carney v. City & Cnty. of Denver*, 534 F.3d 1269, 1273 (10th Cir. 2008) (internal quotation marks omitted).

1092, 1099 (10th Cir. 2005).  The parties agree that the *McDonnell Douglas* framework applies.  *See* Def.'s Mot. at 19; Pl.'s Resp. at 36.

*i.*     *Prima Facie Case*

The burden at the prima facie stage is not onerous.  *Tabor v. Hilti, Inc*., 703 F.3d 1206, 1216 (10th Cir. 2013).  To establish a prima facie case of racial discrimination, a plaintiff must present evidence showing that (1) he belongs to a protected class, (2) he suffered an adverse employment action, and (3) the circumstances surrounding the adverse action give rise to an inference of discrimination.  *Ibrahim v. All. for Sustainable Energy, LLC*, 994 F.3d 1193, 1196 (10th Cir. 2021).[5]  "An inference of discrimination can arise from an employer's favoritism toward a similarly situated employee who is not part of the protected class."  *Id.*

Defendant City concedes that Plaintiff is a member of a protected class as an African American and that he suffered an adverse employment action, but the City disputes that the adverse action, Plaintiff's termination, occurred under circumstances giving rise to an inference of discrimination.  *See* Def.'s Mot. at 21.  As detailed above, Plaintiff alleges four instances in which white OCPD officers who had committed similar violations involving untruthfulness received less severe punishment than Plaintiff.  *See* Pl.'s Resp. at 34, 39-42.  Considering these specific comparator examples most favorably to Plaintiff,

---

[5] The Tenth Circuit has clarified that "[a]lthough the 'articulation of the plaintiff's prima facie test might vary somewhat depending on the context of the claim,' '[t]he critical prima facie inquiry in all cases is whether the plaintiff has demonstrated that the adverse employment action occurred under circumstances which give rise to an inference of unlawful discrimination.'"  *DePaula v. Easter Seals El Mirador*, 859 F.3d 957, 969-70 (10th Cir. 2017) (second alteration in original) (quoting *Kendrick,* 220 F.3d at 1227).

12

and given his light burden at the prima facie stage, *see Tabor*, 703 F.3d at 1216, the Court finds that Plaintiff has satisfied his burden to show an inference of discrimination through Chief Gourley's "favoritism toward . . . similarly situated employee[s] who [are] not part of the protected class." *Ibrahim*, 994 F.3d at 1196. The Court therefore finds that Plaintiff's burden of demonstrating a prima facie case of racial discrimination is satisfied.

Because Plaintiff concedes that Defendant City has satisfied its burden under the second step of the *McDonnell Douglas* framework by proffering a legitimate, nondiscriminatory reason for Plaintiff's termination (untruthfulness), *see* Pl.'s Resp. at 38-39, the Court proceeds to the final step of the analysis.

### ii.    Pretext

The burden now shifts back to Plaintiff to show that "there is a genuine issue of material fact as to whether the proffered reasons [for Plaintiff's termination] are pretextual." *Plotke*, 405 F.3d at 1099. This final step requires that Plaintiff "show that the proffered reasons were so incoherent, weak, inconsistent, or contradictory that a rational factfinder could conclude the reasons were unworthy of belief." *Bekkem v. Wilkie*, 915 F.3d 1258, 1268 (10th Cir. 2019) (internal quotation marks omitted). "Mere conjecture that the employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment." *Id.* (internal quotation marks omitted).

"Evidence of pretext may take a variety of forms." *Dewitt v. Sw. Bell Tel. Co.*, 845 F.3d 1299, 1307 (10th Cir. 2017) (internal quotation marks omitted). One way a plaintiff may show pretext on a disparate-treatment claim is "by providing evidence that he was treated differently from other similarly-situated, nonprotected employees who violated

work rules of comparable seriousness." *Kendrick*, 220 F.3d at 1232. "Employees are similarly situated when they share a supervisor or decision-maker, must follow the same standards, and engage in comparable conduct." *Ibrahim*, 994 F.3d at 1196. "When comparing the relative treatment of similarly situated minority and non-minority employees, the comparison need not be based on identical violations of identical work rules; the violations need only be of comparable seriousness." *Kendrick*, 220 F.3d at 1233 (internal quotation marks omitted).

Plaintiff alleges four instances in which white OCPD officers who committed the same or similar violations as Plaintiff received less severe punishment than Plaintiff. *See* Pl.'s Resp. at 34, 39-42. The Court examines each instance in turn.

### a.   The Brawley P.C. Affidavit

First, Plaintiff argues that Det. Coffey, Off. Lawson, and Lt. Kimberlin, the three white officers who either prepared, signed, or approved the Brawley P.C. Affidavit, were never disciplined for including unsubstantiated statements in the sworn affidavit. *See* Pl.'s Resp. at 40. Defendant City does not dispute that these officers shared the same supervisors and were subject to the same rules and standards as Plaintiff, but the City denies that the officers' conduct in preparing, signing, and approving the Brawley P.C. Affidavit is comparable to Plaintiff's conduct. *See* Def.'s Mot. at 22-23.

Plaintiff was officially terminated for untruthfulness during an administrative investigation and for falsifying a police report. *See* Def.'s Mot. Ex. 27. Like making false statements in an administrative investigation or police report, making unsubstantiated statements in a probable cause affidavit implicates the integrity of the officers who

prepared the affidavit.  OCPD Rule 120.0 states that "[t]estifying, making reports, or conducting business in a less than truthful and cooperative manner is prohibited."  Def.'s Mot. Ex. 22, at 10.  Plaintiff further contends that including unsubstantiated statements in a probable cause affidavit is contrary to OCPD's written policy, specifically Procedure 361.05 prescription that "[a]n officer, who arrests an individual for any drug violation, must perform a field test on the drug(s) and obtain a positive indication for the drug.  The officer is responsible for including this information in the probable cause affidavit."  Pl.'s Resp. Ex. 12 (Doc. No. 114-12) at 2; *see* Pl.'s Resp. at 12.  Additionally, Plaintiff argues that this conduct violates OCPD Procedure 184.30, which instructs that "[f]ield-testing of narcotics will be utilized to identify possible evidence prior to booking of the suspect."  Def.'s Mot. Ex. 4, at 4; *see* Pl.'s Resp. at 12.[6]

Defendant City argues, with supporting evidence, that the unsubstantiated statements in the Brawley P.C. Affidavit representing the weight of the substance and that "[t]he substance later field tested positive for Methamphetamine" were consistent with the OCPD practice regarding field testing at the time.  *See* Def.'s Mot. at 22-23; Def.'s Mot. Ex. 31.  In his deposition, Plaintiff himself stated that it was OCPD's practice at the time to not field test narcotic evidence because of the possible presence of fentanyl.  Def.'s Mot. Ex. 1, at 254:11-255:7.  Plaintiff stated that upon recovering narcotic evidence during an

---

[6] Procedure 184.30 goes on to state that "[i]f other charges are pending on the person in possession of the suspected narcotic, and a field test is not available, that person may be placed in jail on those charges and the suspected narcotics submitted to the lab for chemical analysis."  Def.'s Mot. Ex. 4, at 5.  Brawley was also arrested for soliciting prostitution services.  *See* Def.'s Mot. Ex. 31.

investigation, Vice officers would take the narcotics back to the Vice office for testing.  *See id.*  Then, if the narcotic evidence tested differently than was initially stated in a probable cause affidavit, the officers who prepared the affidavit would be notified and they would correct the affidavit.  *Id.*

Viewing the facts in the light most favorable to Plaintiff as the nonmovant, the Court concludes that no reasonable factfinder could find that the officers' actions in preparing, signing, and approving the Brawley P.C. Affidavit, which contained unsubstantiated statements, were comparable to Plaintiff's conduct in making false statements during the investigation and administrative hearing.  There is no genuine dispute that Det. Coffey, Off. Lawson, and Lt. Kimberlin's actions regarding the Brawley P.C. Affidavit were consistent with OCPD practice at the time or that Plaintiff's making of false statements was not consistent with such practice.[7]  It cannot reasonably be said that actions consistent with a department practice are of comparable seriousness to actions inconsistent with department practice.  Accordingly, Det. Coffey, Officer Lawson, and Lt. Kimberlin are in this respect not similarly situated to Plaintiff and are not proper comparators.

b.    <u>Off. D.G. Brewer</u>

As another example of pretext, Plaintiff argues that he received more severe punishment than Officer D.G. Brewer for violation of rules of comparable seriousness.  *See*

---

[7] This is not to say that the Court agrees with a policy of including yet-to-be-verified statements in probable cause affidavits with the intention of proving them later.  The issue here is not whether this practice was right or wrong, but whether the officers' actions regarding the Brawley P.C. Affidavit were comparable to Plaintiff's actions regarding the missing narcotic evidence.

Pl.'s Resp. at 41.  Off. Brewer was a white officer who was issued a Class III reprimand by Chief Gourley for making false statements to criminal investigators relating to a 2017 domestic assault incident involving Off. Brewer and his then-wife, who was also a police officer.  *See* Pl.'s Resp. Ex. 21.  Plaintiff and Off. Brewer shared the same decision maker, Chief Gourley, and were subject to the same department policies regarding integrity and truthfulness.  *See* Pl.'s Resp. Ex. 21, at 3, 4; Def.'s Mot. Ex. 22, at 4, 10.  But unlike Plaintiff, Officer Brewer was not terminated for his untruthfulness.  *See* Pl.'s Resp. Ex. 21.

Defendant City argues that Off. Brewer was not similarly situated to Plaintiff because Plaintiff's discipline and termination resulted from on-duty activities in which he misled his supervisors while Off. Brewer's discipline resulted from off-duty activities in which he misled criminal investigators.  *See* Def.'s Mot. at 23.  Both instances involve a police officer being disciplined by the same decision maker for untruthfulness, however. Viewing the facts in the light most favorable to Plaintiff, the Court concludes that a reasonable factfinder could find Plaintiff's and Off. Brewer's offenses to be comparable, regardless of when the officers' untruthfulness occurred or to whom the officers were untruthful, and so find the officers to be similarly situated and the rationale for termination to be pretextual as to Plaintiff.  *See Ibrahim*, 994 F.3d at 1197 ("Determining the similarity of the situations is generally a fact question.").

c.   Maj. William Patten

Additionally, Plaintiff argues that Chief Gourley's failure to discipline Maj. William Patten, a white police officer who deleted personal text messages relating to the 2017 Brewer incident, demonstrates that OCPD's explanation for Plaintiff's termination was

pretextual.  *See* Pl.'s Resp. at 34; Pl.'s Resp. Ex. 24, at 32:21-33:6.  Plaintiff argues that Patten intentionally deleted these text messages after a lawsuit was filed against him.  *See id.*  Plaintiff bears the burden of showing that "there is a genuine issue of material fact as to whether Defendants' proffered reasons are pretextual."  *Plotke*, 405 F.3d at 1099. Plaintiff, however, does not explain how Maj. Patten's deletion of these text messages violates any OCPD policy or rule regarding truthfulness.  Accordingly, because Plaintiff has not provided sufficient summary judgment evidence supporting a finding that Maj. Patten's conduct and Plaintiff's conduct are comparable, Maj. Patten is not an appropriate comparator for the purposes of establishing pretext.  *Cf. Kendrick*, 220 F.3d at 1232 ("Differences in treatment that are trivial or accidental or explained by a nondiscriminatory motive will not sustain a claim of pretext.").

### d.   Det. Bryn Carter

Finally, Plaintiff argues that Det. Bryn Carter, a white officer who, during Gourley's tenure as Chief, was publicly accused of perjury in a sworn probable cause affidavit by D.A. Prater, received less severe punishment than Plaintiff for violating a rule of comparable seriousness.  *See* Pl.'s Resp. at 33-34, 42; Pl.'s Resp. Ex. 23.  Following D.A. Prater's allegations, Det. Carter was investigated by OCPD's Internal Affairs unit at Chief Gourley's direction, but Det. Carter was not disciplined as the investigation found the allegations to be unsubstantiated.  *See* Pl.'s Resp. Ex. 5, at 56:1-57:20.

Defendant City contends this incident is not a proper comparator, arguing, "Carter was investigated by OCPD and his case is still the subject of an ongoing investigation by

the Oklahoma Attorney General and/or the Oklahoma State Bureau of Investigation." Def.'s Reply (Doc. No. 118) at 4.

Plaintiff has provided evidence that, if believed, proves that a white officer who was accused of perjury by a public official was cleared by OCPD and not disciplined at all, while Plaintiff, an African American officer, was terminated for his untruthfulness during an internal administrative investigation. Viewing the facts in the light most favorable to Plaintiff, the Court concludes that a reasonable jury could find Det. Carter's alleged conduct to be of comparable seriousness to Plaintiff's conduct, and so find Plaintiff and Det. Carter to be similarly situated. *See Ibrahim*, 994 F.3d at 1197.

Accordingly, because a reasonable jury could conclude that Det. Carter and Off. Brewer were similarly situated to Plaintiff and received greater leniency for their infractions, a genuine dispute of material fact exists as to whether the stated reason for Plaintiff's termination was pretextual. Defendant City is therefore not entitled to summary judgment on Plaintiff's claim of racial discrimination in violation of Title VII of the Civil Rights Act of 1964.

### B.  Racial Discrimination in Violation of 42 U.S.C. § 1981

Defendant City contends that Plaintiff's § 1981 claim is improperly raised, arguing that "[a] proper § 1981 claim against a state actor such as the City of Oklahoma City must be brought under 42 U.S.C. § 1983." Def.'s Mot. at 25. The Court agrees. In the Tenth Circuit, a § 1981 claim cannot be brought against a state actor. *Bolden v. City of Topeka*, 441 F.3d 1129, 1137 (10th Cir. 2006) ("[E]ven after the 1991 amendments to § 1981,

damages claims against state actors for § 1981 violations must be brought under § 1983."); *accord Hannah v. Cowlishaw*, 628 F. App'x 629, 632-33 (10th Cir. 2016).

Plaintiff argues that the § 1981 claim is properly pled because Chief Gourley was Defendant City's final policymaker in terms of employment at the OCPD and he caused Plaintiff to suffer a constitutional violation. *See* Pl.'s Resp. at 46-47. The cases Plaintiff cites in support of this proposition, however, address defendant liability on claims brought pursuant to § 1983, rather than § 1981. *See Monell v. N.Y.C. Dep't of Soc. Servs.*, 436 U.S. 658 (1978); *Schneider v. Grand Junction Police Dep't*, 717 F.3d 760 (10th Cir. 2013). Accordingly, because Plaintiff cannot recover damages under § 1981 against Defendant City as a matter of law, Defendant City is entitled to summary judgment on Plaintiff's § 1981 claim.[8]

### C.   Conspiracy to Violate Plaintiff's Civil Rights

Finally, Defendant City moves for summary judgment on Plaintiff's conspiracy claim. *See* Def.'s Mot. at 26. Plaintiff alleges that "[t]he Defendants, either implicitly or explicitly, entered into an unlawful agreement to deprive Lacaze of his federal rights by agreeing to cause Lacaze's termination because of his race, African American" and that "[t]he Defendants each took an overt act in furtherance of the conspiracy." Compl. ¶¶ 80-

---

[8] Plaintiff did not request leave to amend his Complaint to assert a § 1983 claim against Defendant City.

81.  While the Complaint does not specify, presumably Plaintiff brings his conspiracy claim pursuant to either 42 U.S.C. § 1983 or 42 U.S.C. § 1985(3).

"[A] federal conspiracy action brought under either [§ 1983 or § 1985(3)] requires at least a combination of two or more persons acting in concert and an allegation of a meeting of the minds, an agreement among the defendants, or a general conspiratorial objective." *Brooks v. Gaenzle*, 614 F.3d 1213, 1227-28 (10th Cir. 2010), *abrogated on other grounds by Torres v. Madrid*, 592 U.S. 306 (2021).  Further, "a plaintiff must allege specific facts showing an agreement and concerted action amongst the defendants because conclusory allegations of conspiracy are insufficient." *Id.* at 1228 (alteration and internal quotation marks omitted).

Defendant City argues that Plaintiff only offers conclusory allegations that "a conspiracy had to [have] existed because he faced an adverse employment action" but "is unable to offer any specific facts showing an agreement and concerted action among the defendants." Def.'s Mot. at 26.  In his Response, Plaintiff argues that a rational jury could find that Defendants City, Gourley, Kimberlin, Allen, and Weaver conspired to cause Plaintiff's unlawful termination because "[t]hey were all aware that there were serious policy violations by other officers, but they each acted to minimize those violations and shield white officers from scrutiny." Pl.'s Resp. at 49.  Specifically, Plaintiff contends that "Kimberlin's report intentionally and falsely explained the reason the PC affidavit was false, in an effort to blame Lacaze." *Id*.  Plaintiff offers no specific facts and points to no evidence regarding an agreement or concerted action among the defendants to minimize

the referenced violations, however.  Additionally, Plaintiff's argument that Lt. Kimberlin's report was false implicates only Lt. Kimberlin.

Further, "[f]ederal courts have routinely held that a municipality cannot be liable for a civil conspiracy unless the City could actually be said to have participated through policy or custom." *Hogan v. Winder*, No. CIV-12-123, 2012 WL 4356326, at *5 (D. Utah Sept. 24, 2012), *aff'd*, 762 F.3d 1096 (10th Cir. 2014); *see also Martinez ex rel. N.M. v. Ryel*, No. CIV-20-833-F, 2020 WL 6555946, at *5 (W.D. Okla. Nov. 6, 2020) (noting that a government entity cannot be held liable for a § 1983 civil conspiracy claim based on a theory of respondeat superior).  Plaintiff does not allege or argue that Defendant City participated in a conspiracy to violate his civil rights through a policy or custom.

For the above reasons, and as the record reflects no genuine issue for trial, Defendant City is entitled to summary judgment on Plaintiff's conspiracy claim pursuant to Federal Rule of Civil Procedure 56.

CONCLUSION

For the reasons cited herein, Defendant City of Oklahoma City's Motion for Summary Judgment (Doc. No. 66) is GRANTED IN PART and DENIED IN PART.

Specifically, the Motion is granted as to Plaintiff Reubin B. Lacaze's claims against Defendant City for racial discrimination in violation of 42 U.S.C. § 1981 and for conspiracy

to violate his civil rights. The Motion is denied as to Plaintiff's claim for racial discrimination in violation of Title VII of the Civil Rights Act of 1964.

IT IS SO ORDERED this 29th day of March, 2024.

CHARLES B. GOODWIN
United States District Judge